**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

FREDERICKA BUTLER,

                Plaintiff,

          -v-                        1:23-CV-969 (AJB/ML)

NEW PALTZ CENTRAL SCHOOL
DISTRICT, STEPHEN GRATTO, and
BERNARD JOSEFSBERG,

                Defendants.

_____

**Hon. Anthony Brindisi, U.S. District Judge:**

**<u>DECISION & ORDER</u>**

## I.     INTRODUCTION

Plaintiff Fredericka Butler brings this action against New Paltz Central School District (the "District"), Stephen Gratto, and Bernard Josefsberg pursuant to 42 U.S.C. § 1983 alleging a violation of her rights under the Equal Protection Clause of the Fourteenth Amendment. _See_ Compl., Dkt. No. 1. Before the Court is defendants' motion for summary judgment. _See_ Defs.' Mot. Summ. J., Dkt. No. 31. For the reasons set forth below, defendants' motion is **GRANTED**.

## II.    BACKGROUND

Plaintiff is African American and Latina. Pl.'s Resp., Dkt. No. 41 at 1. In August 2019, plaintiff began working for the District as its inaugural Director of Student Support Services. Pl.'s Resp. to Defs.' Statement of Material Facts ("SOMF"), Dkt. No. 37 at 2 ¶¶ 4–5; Pl.'s Depo., Dkt. No. 31-5 at 6, 10. Plaintiff's responsibilities were varied and diverse. Pl.'s Depo., Dkt. No. 31-5 at 10. Some included supervising the District's nurses, conducting civil rights investigations, overseeing Section 504 processes, Dignity for All Students Act ("DASA") compliance,

health services, instructional observation and evaluation, and restorative practices.  Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 2 ¶ 6; Pl.'s Depo., Dkt. No. 31-5 at 10.  Plaintiff also oversaw "[a]ny kind of student support services performed by counselors from grades 6 through 12." Pl.'s Depo., Dkt. No. 31-5 at 10.  The Director of Student Support Services was a tenure-track position with a four-year probationary administrative appointment.  Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 3 ¶ 8; Offer Letter, Dkt. No. 31-14 at 2.  Plaintiff's probationary window ran from August 19, 2019, through August 18, 2023.  Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 3 ¶ 9; Offer Letter, Dkt. No. 31-14 at 2.

During this time, the District underwent several changes in senior leadership.  Maria Rice, the superintendent when plaintiff was hired, retired later that year, in December 2019. Josefsberg Depo., Dkt. No. 31-6 at 5.  The following month, Bernard Josefsberg began his first stint as the District's interim superintendent.  Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 3 ¶ 13; Pl.'s Depo., Dkt. No. 31-5 at 10; Josefsberg Depo., Dkt. No. 31-6 at 5.  It ended about six months later, when in July 2020, Angela Urbina-Medina became superintendent.  Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 5 ¶ 25.  However, Superintendent Urbina-Medina and the District parted ways in the summer of 2022.  Josefsberg Depo., Dkt. No. 31-6 at 12; *see also id.* ("Q: [D]id you come to any understanding what happened between [Urbina-Medina] and the board?  A: [T]here were financial concerns in the district . . . there was considerable stress in that district and much had to do with budget.").

As a result, in July 2022, Josefsberg was brought back as interim superintendent.  Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 6 ¶ 29.  Josefsberg's second term lasted about six months, this time ending in December 2022.  *See* Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 21 ¶ 76.

Stephen Gratto replaced Josefsberg as superintendent on January 1, 2023. Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 21 ¶ 76; Gratto Depo., Dkt. No. 31-7 at 3.

In early December 2022, prior to Gratto's official start date, he and Josefsberg discussed three administrators who were set to have tenure decisions made in 2023: Ross Hogan, Sean Inglee, and plaintiff. Hogan and Inglee are white men. At the time, both were elementary school principals. *See* Gratto Decl., Dkt. No. 31-8 at 14; Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 13 ¶ 54, 25 ¶ 95. Josefsberg gave Gratto his assessment of each of the three, which Gratto recorded in his notes. *See, e.g.*, Dec. 1, 2022, Gratto Notes, Dkt. No. 31-21 at 1 ("Sean Inglee — Not much evidence that he can do more than what he is doing. Needs to have more initiative. He has not blossomed. Mostly in office behind computer. Not a flashpoint for teachers. Parents questioning his impact. Style a bit cool. Bright. Handles conflict fairly well. It is a job for him. Slow to respond to parent[s]."); *id.* ("Ross Hogan — Good. Concerns have eased. Bright. More candid about what he is trying to do[.] Some insight about teachers. Some insight about teachers. He defends his building. [C]onfident he will work well with you."); *id.* at 2 ("Ricki Butler — High maintenance. Very forward in presenting herself to others. Annoys people. Trying to get things done. Trying to make her mark. Genuinely wants to help people. First 2 or 3 years, did mostly DASA as a compliance officer. Charged with doing more of that. She feels she has a mandate from Bernie [Josefsberg]. Carrying restorative justice torch. On a mission. Temper of sorts. Edge to her. Very good with classroom observations[.] Strong arming nurse, very inappropriate.").

On January 13, 2023, plaintiff met with new Superintendent Gratto and Assistant Superintendent for Business Debra Kosinski. Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 22 ¶ 80; Jan. 13, 2023, Gratto Notes, Dkt. No. 31-21 at 4. Gratto presented plaintiff with a *Juul* agreement

and asked her to sign it.[1]  Pl.'s Depo., Dkt. No. 31-5 at 41.  Gratto "expressed [to plaintiff] that the decision to do a JUUL agreement was based partly on a lack of observations and partly on comments made by Bernie Josefsberg."  Jan. 13, 2023, Gratto Notes, Dkt. No. 31-21 at 4.  Those "[c]omments included annoying people and being a crusader."  *Id.*

About a month later, on February 14, at Gratto's request, Deputy Superintendent Linda Oehler-Marx and Assistant Superintendent Kosinski met with plaintiff.  Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 23 ¶¶ 85–86. At this meeting, plaintiff was told that she needed to submit her signed *Juul* agreement by March 15, 2023, or that she would need to resign.  *Id.* at 23 ¶ 86.  Plaintiff was also told that she was valued in the district and that the district wanted her to stay, but if she was not going to accept the additional probationary year, the District had to make plans to start recruiting.  *Id.* at 23–24 ¶ 87.

Later that month, plaintiff requested to meet with Gratto again to discuss her tenure candidacy.  *Id.* at 24 ¶ 90.  Gratto agreed to meet, but he told plaintiff that his decision on the additional probationary year would not change.  *Id.*  In lieu of meeting, plaintiff and Gratto spoke on the phone.  *Id.*  Gratto reiterated that the decision was not going to change.  *Id.* at 24 ¶ 91.  Eventually, plaintiff signed the *Juul* agreement and submitted it to the District.  *Id.* at 24–25 ¶ 92.

As with plaintiff, Gratto extended Hogan and Inglee *Juul* agreements, which they too signed, and on March 15, 2023, on Gratto's recommendation, the Board approved one-year extensions of the probationary periods for the three administrators.  *See* Defs.' Resp. to Pl.'s Interrog. No. 11, Dkt. No. 31-8 at 16; Pl.'s *Juul* Agreement, Dkt. No. 31-25 at 2; *Juul* Agreements of

---

[1] The term "*Juul* agreement" refers to *Juul v. Bd. of Ed. of Hempstead Sch. Dist. No.*, 428 N.Y.S.2d 319 (2d Dept. 1980), "which held that absent coercion or bad faith, 'a probationary teacher who is aware that a board of education intends to deny him tenure, may validly waive his right to tenure and be employed for an additional year without acquiring tenure as a quid pro quo for re-evaluation and reconsideration of the tenure determination at the end of the extra year.'"  *Paupaw-Myrie v. Mount Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 89 (S.D.N.Y. 2023) (quoting *Juul*, 428 N.Y.S.2d at 321).

Inglee and Hogan, Dkt. No. 31-20 at 2–3.  Gratto did not recommend *any* administrators for tenure during the 2022–23 school year.  Defs.' Resp. to Pl.'s Interrog. No. 10, Dkt. No. 31-8 at 15–16.

Each year, the Board typically adopts a budget for the upcoming school year around mid-March or early April.  Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 26 ¶ 99.  In Spring 2023, the district was facing a budget deficit of several million dollars.  *Id.* ¶ 100.  Gratto presented options to the Board and to the public in which he tried to make a case for why the district should not eliminate any administrative position beyond a part-time coordinator role.  *Id.* ¶ 102.  In addition to cutting this coordinator role, the initial proposed budget options contemplated eliminating several teaching positions and social workers.  *Id.* ¶ 103.  Though this would decrease the budget gap, it would not entirely alleviate it.  Already anticipating the loss of union membership positions, the teachers' union strenuously advocated for more cuts to the administration instead.  *Id.* ¶ 105.  Accordingly, the Board directed Gratto to eliminate an administrative position.  *Id.* ¶ 106.

Superintendent Gratto, Deputy Superintendent Oehler-Marx, and Assistant Superintendent Kosinski determined that plaintiff's position could be eliminated.  *Id.* ¶ 107.  Thus, on April 18, 2023, following Gratto's recommendation, the Board voted to abolish plaintiff's position, the Director of Student Support and Community Engagement, effective June 30, 2023.  *Id.* ¶ 113.  On August 9, 2023, plaintiff filed this suit.  *See* Compl., Dkt. No. 1.

## III.   STANDARD OF REVIEW

Under Rule 56, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCutcheon v. Colgate-*

5

*Palmolive Co.*, 62 F.4th 674, 686 (2d Cir. 2023) (quoting *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017)).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Hilton v. Wright*, 928 F. Supp. 2d 530, 544 (N.D.N.Y. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In reviewing the motion, the district court must 'draw all reasonable inferences against the party whose motion is under consideration.'" *Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 215 (N.D.N.Y. 2024) (quoting *Williams v. MTA Bus Co.*, 44 F.4th 115, 125 (2d Cir. 2022)). However, "[a] question of material fact does not exist merely because plaintiff disagrees with the deposition testimony and documentary evidence produced by defendant[s]." *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 131 (E.D.N.Y. 2023) (citing *Anderson*, 477 U.S. at 247–48).

When a moving party has carried its burden under Rule 56(c), its opponent "must provide more than conclusory allegations . . . and show more than some metaphysical doubt as to the material facts." *See Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 85 (2d Cir. 2025) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)). Rather, "[t]he non-moving party 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.'" *Murrell v. Moscicki*, 790 F. Supp. 3d 213, 220 (W.D.N.Y. 2025) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). "Indeed, 'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Campbell v. Belgard*, 765 F. Supp. 3d 234, 241 (W.D.N.Y. 2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

"In sum, the ultimate test 'is whether the evidence can reasonably support a verdict in plaintiff's favor.'" *Waltman v. United Servs., Inc.*, 635 F. Supp. 3d 86, 98–99 (D. Conn. 2022) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Waltman*, 635 F. Supp. 3d at 99 (quoting *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015)).

## IV.    DISCUSSION

### A.    Procedural Deficiencies

As an initial matter, it was needlessly onerous to determine which facts are undisputed and which are material—largely due to plaintiff counsel's misuse of the Local Rule 56.1 procedure.

Under the local rules, an opposing party's response to a movant's statement of material facts must "mirror the movant's Statement of Material Facts by admitting and/or denying each of the assertions in a short and concise statement, in matching numbered paragraphs." N.D.N.Y. Local Rule ("L.R.") 56.1(b). "Each denial shall set forth a specific citation to the record where the factual issue arises." *Id.* Importantly, "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.*

Plaintiff's response to defendants' statement of material facts breaks this rule. It mixes arguments and conclusions of law with statements of fact. Some factual claims lack citations to the record; in other instances, the cited evidence does not support the claim. *See, e.g.*, Dkt. No. 37 at 20 ¶ 70 ("Admit that this testimony was provided but deny that it is truthful for the reasons already stated."); *id.* at 17 ¶ 65 ("Deny to the extent that this statement falsely implies that Inglee

7

or Hogan received formal evaluations during the relevant period (see response to #64)."); *id.* at 19 ¶ 69 ("Admit that this testimony was provided but . . . this . . . creates a fundamental question of fact—who made the decision and on what bases?"); *id.* at 20 ¶ 73 ("Deny as stated."); *id.* at 25 ¶ 93 ("Deny as stated.  In or about (date) [sic] plaintiff verbally complained[.]"); *id.* at 27–28 ¶ 107 ("Admit this testimony was provided but deny the basis and merits of defendant Gratto's determination that plaintiff's position could be eliminated with the 'least impact'[.]"); *id.* at 29 ¶ 111 ("Admit that defendants cited these two reasons for the elimination of plaintiff's position but deny that they were legitimate and non-discriminatory."); *id.* at 17–18 ¶ 66 (stating "Admit and further note . . . " followed by over a page of unresponsive factual assertions and ineffectual arguments).

These are all unacceptable responses.  "If the material fact proffered by the movant is (1) accurate and (2) supported by the citation on which it is based, the non-movant should just admit the statement and move on."  *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 725 (N.D.N.Y. 2020).

Plaintiff has also filed a "Counterstatement of Facts [sic]," *see* Dkt. No. 37 at 36–54, which her counsel appears to believe is an opportunity to present their own narrative—regardless of whether the facts contained in the Counterstatement are in dispute.  Counsel is mistaken.  *See* N.D.N.Y. L.R. 56.1(b) ("[T]he opposing party[] may set forth any assertions that the opposing party contends *are in dispute* in a short and concise Statement of *Additional* Material Facts *in Dispute*[.]") (emphases added).

Plaintiff's opposition papers, in presenting the factual background of this case—and, frankly, in most citations to the record—relies nearly exclusively on this "Counterstatement of Facts." *See, e.g.*, Dkt. No. 41 at 7–11.  But under the local rules, the purpose of the

"Counterstatement," also called the "Statement of Additional Material Facts in Dispute," is not to provide a non-movant a convenient spot to slip in additional argument, present wholly superfluous facts, or recharacterize undisputed facts in a favorable gloss.  *See Riley v. Town of Bethlehem,* 5 F. Supp. 2d 92, 93 (N.D.N.Y. 1998) (The local rule "is not a suggestion, nor is it a rule of general guidance upon which attorneys are free to impose their own interpretations of what must be submitted"); *cf. Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 309 (E.D.N.Y. 2013) ("Plaintiffs [improperly] make legal arguments in their Rule 56.1 Statement that should appear only in their memorandum of law.").

Worse still, despite creating such a repository of "facts" for herself via this Counterstatement, plaintiff's opposition brief somehow manages to go through paragraph after paragraph, sometimes even spanning multiple pages, offering factual assertions without citing to anything supportive in the record—not even the Counterstatement.  *See generally* Pl.'s Resp. to Mot. Summ. J., Dkt. No. 41.

Again, this is not procedurally acceptable.  Plaintiff's counsel sorely misunderstands the purpose of Local Rule 56.1.  It is not to give parties more chances to advance legal arguments. *See Zaniewska v. City of N.Y.*, 2013 WL 3990751, at *1 n.3 (E.D.N.Y. Aug. 5, 2013), *aff'd,* 569 F. App'x 39 (2d Cir. 2014) ("A 56.1 statement is not the appropriate vehicle for legal arguments or recharacterizations of the evidence."); *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 838 (S.D.N.Y. 2018)  ("Rule 56.1 statements are not argument.").

 It is not even intended for the parties' benefit: "Following this and other aspects of [the] Local Rule . . . saves the reviewing court the trouble of having to do what this Court is doing right now—double- and triple-checking each individual factual allegation to try to determine

whether it is genuinely in dispute or whether the non-movant just wants it to appear to be in dispute[.]" *Crawley*, 496 F. Supp. 3d at 725.

Understandably, defendants declined plaintiff's tacit invitation to rework their statement of material facts as a response to her improper Counterstatement simply because plaintiff's counsel failed to follow a set of simple instructions. *See* Defs.' Resp. to Pl.'s Counterstatement, Dkt. No. 45 at 2 ("For the sake of brevity and efficiency[,] the defendants respectfully refer the Court to their Local Rule 56.1 Statement of Facts for facts that they contend are undisputed[.]").

The Court has half a mind to grant defendants' accompanying request *in toto*: disregard plaintiff's improper Counterstatement entirely and deem admitted every fact that plaintiff did not specifically controvert in her response to defendants' statement of material facts.[2] *See id.* Doing so, though, would be akin to plaintiff having never submitted an opposition at all. That would not be affording plaintiff's claims the due consideration that she deserves.

Therefore, the Court will look past the deficiencies in her counsel's submissions and conduct a substantive review of the material that has been provided. However, plaintiff's counsel should not misinterpret this result as the Court acquiescing to these deficiencies. Counsel is hereby cautioned that future failure to comply with Local Rule 56.1 will not be tolerated or rewarded by this Court and may result in future procedurally-improper filings being stricken or disregarded. *See, e.g.*, *LaFever v. Clarke*, 525 F. Supp. 3d 305, 320 (N.D.N.Y. 2021) (deeming

---

[2] *See also Rodriguez v. Schneider*, 1999 WL 459813, at *1 (S.D.N.Y. June 29, 1999) ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention. It is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute. However, this separate statement is *not* a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation."), *aff'd*, 56 F. App'x 27 (2d Cir. 2003).

admitted defendants' facts after observing plaintiff's counsel had already been put on notice of relevant local rule).

## B.      The Merits

Plaintiff asserts three § 1983 equal protection claims under the Fourteenth Amendment—one against Josefsberg for "refusing to recommend her for tenure based on racial stereotypes"; another against Gratto for "knowingly adopting Josefsberg's racially-tainted recommendation and refusing to recommend plaintiff for tenure"; and a third against Gratto and the school district for Gratto's "recommending the elimination of . . . only plaintiff's full-time, administrative position[.]" *See* Compl., Dkt. No. 1 at 9–10.

"The analytical framework of a workplace equal protection claim parallels that of a discrimination claim under Title VII." *John v. Bridgeport Bd. of Educ.*, 2011 WL 1106708, at *22 (D. Conn. Mar. 22, 2011) (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004)). "Thus, an employment discrimination claim brought pursuant to the Equal Protection Clause is analyzed using the *McDonnell Douglas* burden-shifting framework." *Id.* (internal citations omitted).

## 1.      Deferral of Tenure Decision

Plaintiff's claim against Josefsberg hinges on a false dichotomy: anything short of Josefsberg's full endorsement of plaintiff for tenure—whether to Gratto or to the Board—amounted to outright denial.  Not so.

The undisputed record establishes that he left the decision to Gratto.  Josefsberg Depo., Dkt. No. 31-6 at 20 ("A: In November or December, in that time frame I told [plaintiff] that as a nontenured administrator she would be joining two other nontenured administrators and that Steve Gratto, my successor, would deal with the question of tenure.  Q: When you say she would

be joining, what do you mean when you told her she would be joining?  What do you mean?  A: She was among one of three nontenured administrators in the district.  It was my position that I had no—it was not my call.  That those three nontenured administrators should be evaluated by my successor and that I would so recommend to my successor and I told her that.").

True, Josefsberg did not simply abstain entirely and say nothing to Gratto on the issue. Josefsberg did make a recommendation of sorts regarding deferral.  But plaintiff conflates matters by treating Josefsberg's suggestion as tantamount to him recommending she be denied tenure entirely.  His suggestion concerned the *timing* of a decision on plaintiff's tenure, not whether she merited tenure.  Josefsberg recommended that she, along with two other administrators up for review, be offered another probationary year.  This would give Gratto personal experience with each of his new subordinates and allow Gratto to make an informed decision on their candidacies the following year.  Josefsberg Depo., Dkt. No. 31-6 at 20–21 ("A: I told Gratto that it was his responsibility to evaluate the nontenured administrators in the district and reach his own decisions.  He was the one that had to work with them."); *see also id.* at 20 ("Q: Did you make a tenure recommendation to Mr. Gratto with regard to Inglee?  A: No.  Q: Did you make a tenure recommendation with regard to Hogan?  A: No.  Q: Did you make a tenure recommendation with regard to Butler?  A: No.").

Plaintiff attempts to cast these facts as disputed:

Gratto and Josefsberg provided differing accounts to plaintiff during her employment concerning who made the final tenure decision.  [P]laintiff was advised that Josefsberg, not Gratto, made the decision because Gratto told her that tenure had been decided *before* his arrival and cited remarks by defendant Josefsberg.  On other occasions, Josefsberg told plaintiff that it was Gratto's decision, stating, "If it was up to me, you'd have tenure."  Butler Depo. at 156:20–158:1; 153:152[sic]– 153:8.  This conflicting testimony creates a fundamental question of fact—who made the decision and on what bases?

Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 19 ¶ 69.

Plaintiff relies solely on her own testimony to profess that "conflicting testimony" exists, thereby creating an issue of fact. But simply recounting that she was told different things by Josefsberg and Gratto does not, alone, create a genuine dispute—especially here, where nothing plaintiff presents contradicts the rest of the evidence in the record. *See, e.g.*, Jan. 11, 2023, email from plaintiff to Gratto, Dkt. No. 31-23 at 2, 3 ("[A]s you know, Bernie [Josefsberg] told me that the decision has been made to offer me a *Juul* year, as I will not be recomme[nded] tenure *this year*.") (emphasis added).

For instance, plaintiff states that "Gratto told [her] that tenure had been decided before [Gratto's] arrival[.]" Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 19 ¶ 69. From there, plaintiff makes a vast leap—translating this to mean that Gratto told her that "tenure" was Josefsberg's decision. *See id.* ("Gratto and Josefsberg provided differing accounts to plaintiff . . . concerning who made the final tenure decision. [P]laintiff was advised that Josefsberg, not Gratto, made the decision because Gratto told her that tenure had been decided before his arrival and cited re-marks by defendant Josefsberg.").

That leap is not supported by anything in the record. Rather, the record simply reflects that Gratto informed plaintiff that—even before he had formally assumed the superintendency—Gratto had already come to the decision to defer tenure decisions for his subordinates (including plaintiff) for another year. Gratto Decl., Dkt. No. 31-8 at 3 ("The decision to offer an extension of the probationary period and a *Juul* agreement to the plaintiff was mine and was made by me before I officially assumed my role as Superintendent."); *see also* Dec. 11, 2022, Update from Gratto to Board, Dkt. No. 31-24 at 4 ("Tenure for Administrators[:] Thank you for your support of the idea to not give tenure immediately to Ross Hogan, Sean Inglee, and Ricky Butler. I at-tach a sample *Juul* agreement that I have used in the past."); Jan. 13, 2023, Update from Gratto

13

to Board ("[O]n Friday I put a dent in the overall good humor by telling three administrators that we were going to put them on a *Juul* agreement instead of acting on their tenure at the end of the month.").

Even plaintiff's testimony aligns with these facts. *See, e.g.*, Pl.'s Depo., Dkt. No. 31-5 at 40 ("Q: [W]hen did Dr. Josefsberg tell you that he favored tenuring you and that Gratto had decided not to recommend you?  A: After he first told me that I was not getting tenure because he was not recommending me . . . he would mention, 'If it was up to me, you'd have tenure.  But Dr. Gratto [sic] has decided that you're not going to have tenure because he hasn't had enough time to get to know you, and three months is not enough time.'").

It is evident that plaintiff blames Josefsberg for Gratto's call to punt on making a tenure decision and instead offer her a *Juul* agreement for another probationary year.  But the record demonstrates that the decision was Gratto's to make, and that it was Gratto who extended the *Juul* offer.  *See, e.g.*, Pl.'s Notes from Jan. 13, 2023, meeting with Gratto, Dkt. No. 39-8 at 2 ("Was not endorsed for tenure—I've had a lot of bosses over the years.  One of the biggest mistakes he can make is to give tenure to someone who is not outstanding—It's a mistake to put a bad leader[3] in[.]  Doesn't want to make decision about tenure in 2–3 months.").

Just the same, plaintiff has a fallback position.  In her view, even if Gratto was the one who ultimately chose to defer the tenure decision, plaintiff asserts that Josefsberg exerted undue influence on Gratto, tainting Gratto's perception of her and persuading him to defer.  Plaintiff believes that this alleged undue influence was informed by Josefsberg's purported racial animus towards her.  *See* Pl.'s Resp. to Defs.' Mot. Summ. J., Dkt. No. 41 at 21 ("Defendant Josefsberg's racial bias against Plaintiff tainted Defendant Gratto's tenure decision").

---

[3] Given plaintiff's handwriting, the word "leader" could be "teacher."  Regardless of which noun it is, the sentiment remains the same.

14

In support of her theory of Josefsberg's racial animosity, plaintiff cites a brief interaction between herself and Josefsberg in July 2022. Josefsberg walked into plaintiff's office and asked her whether she believed in the concepts of white privilege and institutional racism. *See* Pl.'s Resp. to Defs.' Mot. Summ. J., Dkt. No. 41 at 8; Compl., Dkt. No. 1 ¶ 18; Pl.'s Depo., Dkt. No. 31-5 at 18. Plaintiff responded in the affirmative. Pl.'s Depo., Dkt. No. 31-5 at 18. After plaintiff answered, Josefsberg told plaintiff "that [they would] have to have a conversation about that." *Id.*

Josefsberg then left her office. *Id.* Josefsberg never initiated a follow-up discussion with plaintiff. *See* Josefsberg Depo., Dkt. No. 31-6 at 14. ("Q: If it's likely you used the words which she attributes to you, quote, 'we will have to talk,' do you have any recollection what you were referring to? A: That it was a thick concept that we would probably deal with and work together with. Q: Did you ever initiate any follow-up discussion with her about either of those concepts that you remember? A. Not directly, no."). Josefsberg concedes he did not have the same conversation with any other administrator. *Id.*

After this interaction, plaintiff says that Josefsberg's attitude towards her hardened. Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 7 ¶ 32; *see* Pl.'s Depo., Dkt. No. 31-5 at 20 ("He would call me into his office without any indication that he was going to make any complaints[.] That began to happen on a regular basis. Q: When you say, 'regular basis,' what do you mean by that? A: Either by email or in person at least twice a week.").

In one instance, Josefsberg told plaintiff that she "did not know how to resolve conflicts peacefully or effectively," citing her interactions with Arielle Chiger, then-president of the teachers' union, as an example. Pl.'s Depo., Dkt. No. 31-5 at 20. Earlier that summer, Chiger filed a hostile work environment claim with the district. *Id.* At the time, plaintiff served as the district's

civil rights coordinator, investigator, and decisionmaker regarding all claims brought by faculty members. *Id.* at 16. After a multi-month investigation, plaintiff found Chiger's claim to lack merit. *Id.* Angry with this conclusion, Chiger emailed Josefsberg, Urbina-Medina, and Martoni to complain, cc'ing plaintiff. *Id.* In turn, plaintiff, wanting to respond to Chiger's accusations "one by one," sent an email to the same recipients. *Id.* at 20; *see also id.* ("[O]nce Dr. Josefsberg received it . . . he said, 'What's with this six-page email you sent me?' I asked if he read it. He said he did not. I told him that I was responding to the email that Arielle Chiger had sent[.] He told me that, at some point, we have to sit down, and he has to show me or teach me the proper way to send an email to a superintendent."). Despite acknowledging the substance of this illustration proffered by Josefsberg, plaintiff did not feel that the situation with Chiger was "really a relatable example" of her conflict resolution skills. *Id.* at 20–21. She believed "that there were some other reasons why [Josefsberg] was sharing this." *Id.* at 20.

On another occasion, Josefsberg told plaintiff that she "needed to be kind to the athletic director." *Id.* at 21. Josefsberg had not, however, made a reciprocal request of the athletic director. *See id.* ("[I] asked him if he has also said the same things to the athletic director about the way he spoke to me or behaved towards me. And he said no, he had not.").

Plaintiff's testimony suggests that Josefsberg felt plaintiff could be abrasive and challenging to work alongside—and that he told her as much. *Id.* at 19 ("Josefsberg told me that I was—although my performance was very good, I was tough, and being tough was going to ruin my career."); *id.* at 32 ("[M]y understanding was that he felt all along that I was worthy of tenure. And he said I was difficult to work with. I said, 'Well, what do you mean by that?' And he said, 'Oh, you know what? I take it back. I should have never said that.' So I never got an example of what he meant."); *id.* at 21 ("He also told me that I was—I talked too much. And he did not like

when he was speaking to me and I was nodding my head while he spoke.  He told me that—and

he told me this in an angry tone, 'Stop nodding your head.  You haven't heard anything I said so

you can't possibly agree with everything I've said.'").

The record reflects that Josefsberg conveyed congruous views about plaintiff's demeanor

to Gratto.[4]  *See* Gratto Depo., Dkt. No. 31-7 at 12 ("Q: [U]nder 'Ricki,' as I understand it, [your

notes] say[] high maintenance, very forward in presenting herself to others, annoys people.  Do

you see that?  A: Yes.  Q: [T]o your memory, those words that I just read starting with high

maintenance . . . is this verbatim what [Josefsberg] said?  A: Yes."); *id.* at 15 ("[W]hat Dr.

Josefsberg told me was that sometimes she annoyed people[.]").

Josefsberg also told Gratto that plaintiff had a temper and anger issues.  Pl.'s Resp. to

Defs.' Mot. Summ. J., Dkt. No. 41 at 10; *see* Pl.'s Depo., Dkt. No. 31-5 at 41 ("Gratto said . . .

Dr. Josefsberg attributed certain character traits to me that he had concerns about: I had a temper,

I had anger issues.  I don't remember the third one, but there were three adjectives that he

used."); Gratto Depo., Dkt. No. 31-7 at 17 ("Q: Did you indicate . . . that Josefsberg told you that

she had a temper?  A:  Yes."); *but see* Gratto Depo., Dkt. No. 31-7 at 23 ("Q: Did you say that

Bernie [Josefsberg] had told you that she had a quote, 'temper'?  A: I did not tell her that."); *see*

*also* Pl.'s Jan. 13, 2023, notes, Dkt. No. 39-8 at 2–3 ("Bernie's assessment/concerns—(1) Very

---

[4] Gratto appears to have come to (or adopted, as plaintiff alleges) some of these views himself.  *See, e.g.,* Jan. 13, 2023, Update from Gratto to Board, Dkt. No. 31-24 at 7 ("Ricki Butler — This one did not go well.  Ricki and I met with Deb Kosinski who served as a witness since Ricki is no longer in the administrative bargaining unit.  Ricki was cold and business-like throughout.  She did not say much or really even look up, she simply took notes the whole time.  Bernie had told her that the *Juul* agreement was necessary because she did not have enough evaluations.  The day before our meeting she had produced a positive evaluation from a former supervisor and I think she thought I was going to change my mind about the *Juul* agreement.  However, when I told her some of the concerns Bernie had expressed to me, including annoying other people and pushing forward with things too aggressively, she was not very happy.  At the end of the meeting I asked her if she could sign the document and give it to me before the board meeting.  She said that if she decided to sign it she would probably give it to me by June.  Then she left.  I don't know Ricki as well as you guys do so I am not sure how to interpret her reactions.  I found them surprising and kind of concerning.").

forward in presenting themselves to others.  Generally wants to help people.  (2) Temper.  (3) [C]oncerned I might go over the top + turn people off.  Rec. that I have a diff. job.").[5]

At bottom, plaintiff asserts that "Josefsberg's negative remarks invoked the racial stereotype of 'the angry Black woman'—a response to her affirming to him that she believed in the concepts of white privilege and institutional racism[,]" and that "Gratto adopted Josefsberg's racially stereotypic evaluation of plaintiff in his decision to deny her tenure."  Pl.'s Additional Facts, Dkt. No. 37 at 45 ¶¶ 78, 79.

The Court recognizes that "[e]specially in predominantly white workplaces, African Americans regularly experience forms of racism that are less explicit but no less insidious." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 413 (4th Cir. 2022) (Motz, J. concurring). "For instance, when an African American woman asserts herself, she is often tagged by her supervisors and coworkers as an "angry Black woman," a harmful and well-rooted racial stereotype." *Id.* (citing *Curry v. Devereux Found.*, 541 F. Supp. 3d 555, 561 (E.D. Pa. 2021)).

Though Josefsberg did not use any explicit racial terms, plaintiff submits that he used the descriptors above to invoke the pernicious stereotype of an "angry black woman."  *See Thelwell v. City of N.Y.*, 2015 WL 4545881, at *10–11 (S.D.N.Y. July 28, 2015) (citing *Heard v. Bd. of Trs.*, 2013 WL 142115, at *12 (E.D. Mich. Jan. 11, 2013) (defining the "angry black woman" stereotype as, among other things, "a shrill nagger with irrational states of anger and indignation").

---

[5] *See also* Pl.'s Depo., Dkt. No. 31-5 at 42 ("Q: Was anyone else present when Mr. Gratto told you these three reasons were given about your personality?  A: Debra Kosinski, assistant superintendent for business."); *id.* at 47 ("A: [Kosinski] told me that, in the meeting, Mr. Gratto said I pushed my work off on other people, I was pushy, and I think she said that I had—that I had a temper.  What I remember specifically because, I said 'I know, Deb, that he did not say I pushed my work off on other people.  He never said that.'  She said, 'Well, that's what I remember.' And I said, 'He never said I was pushy.'  And she said, 'Well, that's what I remember.'  And I said, 'Well, I do know it was told to me that I was forward.'  And she said, 'Oh, well, yeah, when people say somebody is 'forward,' I consider them pushy.  So that's what I mean.'  And then we ended the conversation.").

"[C]ertain words standing alone might be facially non-discriminatory or appear to be benign but nonetheless may be understood as racist code words, which may in part depend on the speaker's inflection, tone of voice, local custom, and historical usage." *Brockman v. NAES Corp.*, 2021 WL 863471, at *4 (D. Conn. Mar. 8, 2021) (citing *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006)). "[F]ederal anti-discrimination laws 'can hear bigotry sung in the whistle register.'" *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 269 (S.D.N.Y. 2025) (internal alterations omitted) (citing *Lloyd v. Holder*, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) (collecting cases); *Brockman*, 2021 WL 863471, at *4 ("[W]ords like 'welfare queen,' 'terrorist,' 'thug,' and 'illegal alien'[;] the mocking use of 'black slang' such as 'yo bro' and 'wassup' and references to 'fried chicken' [and] 'ghetto'[;] a reference to the plaintiff as a 'drug dealer'[;] [and] even the use of 'code words' such as 'all of you' and 'one of them' could be sufficient evidence from which a jury could find an intent to discriminate.")). So too can the U.S. Constitution.

However, even viewed in the light most favorable to her, the descriptors that plaintiff identifies here do not rise to the level of racial code words. "There is no evidence from context that the terms . . . were racially charged in any way, and there is no evidence that in her entire employment . . . anyone used a racial epithet to describe the plaintiff." *Thelwell*, 2015 WL 4545881, at *10–11. Nothing in Josefsberg's comments or the record suggests he engaged in racial stereotyping. For his part, Josefsberg maintains that any remarks he made reflected sincere concerns about plaintiff's behavior and what he perceived as plaintiff's contentious relationships with other personnel. *See, e.g.*, Josefsberg Depo., Dkt. No. 31-6 at 28 ("A: [I] talked to her about conflictive relationships. I talked about strained relationships. I talked about her need to temper her emotions. But I don't believe I said [she] had anger issues. That would be—(interrupted)

Q: You said temper her emotions.  In what context did you say she should temper her emotions.  A:  In the context of reducing her—improving her relationships with other personnel in the district.  Q: Who were you referring to at that time other than [the athletic director]?  A: She was in conflictive relationships with the nurses.  The union was concerned about her.  I was encouraging her to improve her relationship with the union leadership in the high school.").

Moreover, the record shows this is not concocted, self-serving rhetoric by Josefsberg—others, including non-defendants, appear to have shared these apprehensions.  *See, e.g.*, Deputy Superintendent Martoni's July 2022 Summary Feedback to Plaintiff, Dkt. No. 31-19 at 5 ("Your tenacity in face of union issues is admirable.  As new union leadership is upon the District, I recommend a tempered response as relationships build."); *see also* Feb. 17, 2023, Update from Gratto to Board, Dkt. No. 31-24 at 15 ("Apparently, at a faculty meeting this week one or more teachers were upset with comments made by Ms. Butler . . . High School union reps reached out to me after . . . to explain what happened since they believed, correctly, that I had heard about the contentious nature of the faculty meeting.  [T]hey mostly blamed insensitive comments made by Ms. Butler as having been the fuel to the fire that made the meeting go badly."); *see* Pl.'s Depo., Dkt. No. 31-5 at 14 ("Q: At any point that Angela Urbina-Medina was superintendent, did she ever give you any negative feedback[?]  A: Yes.  Q: What did she convey to you?  A: She conveyed that my emails could be misunderstood and be taken . . . in a way that I don't mean them to be taken.").

No doubt, "[a]llegations that a plaintiff was stereotyped as an 'angry black woman' could support a claim for racial and/or gender discrimination[.]"  *Thelwell*, 2015 WL 4545881, at *10–11.  But here, "plaintiff's subjective interpretation [of Josefsberg's] use of critical but facially non-discriminatory terms does not, itself, reveal discriminatory animus."  *See id.* (citing

*Humphries v. City Univ. of N.Y.*, 2013 WL 6196561, at \*9 (S.D.N.Y. Nov. 26, 2013) (dismissing discriminatory termination case wherein plaintiff asserted she was stereotyped as an "angry black woman")).[6]

Furthermore, plaintiff does not assert that Gratto, in choosing to defer a decision on her tenure, harbored any discriminatory animus toward her.  *See, e.g.*, Pl.'s Resp., Dkt. No. 41 at 23 ("[J]osefsberg advised [Gratto] that she had 'anger issues' and 'a temper.'  Gratto had no independent basis to form such conclusions about plaintiff.").  Rather, she maintains only that "[o]n January 13, 2023, during his second week of employment and long before he needed to reach any conclusion concerning plaintiff's tenure, defendant Gratto adopted Josefsberg's tainted recommendation . . . and communicated it to plaintiff."  *Id.* at 22.

Even viewed in the light most favorable to her, plaintiff has offered only her subjective beliefs about Josefsberg's statements and motives.  Absent more, no rational factfinder could conclude that Josefsberg's recommendation was in fact "tainted" by any discriminatory animus.  Thus, plaintiff has failed to demonstrate that the deferral decision—regardless of who made it, Josefsberg or Gratto—was impermissible.  Particularly so where Hogan and Inglee, both white male administrators, received the same offers under the same circumstances.

Besides, it is questionable that extending a *Juul* agreement alone qualifies as an adverse employment action.  "[S]chool districts may extend the probationary term for one year and postpone the tenure decision."  *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) (citing *Borkowski*

---

[6] *See also Smith v. Hous. Auth. of the Cnty. of Dauphin*, 2010 WL 4916709, at \*10 (M.D. Pa. Nov. 2, 2010*), aff'd*, 439 F. App'x 140 (3d Cir. 2011) ("Finally, Plaintiff has argued that [supervisor's] characterization of Plaintiff as confrontational or aggressive at times is itself somehow suggestive of racial discrimination because, in Plaintiff's view, this suggests that he has been stereotyped as an "angry black man."  But Plaintiff has virtually nothing, aside from his own interpretation, to suggest that [supervisor's] characterization of Plaintiff's occasional tendency to become confrontational was in any way based upon racist views.  Plaintiff's suggestion that [supervisor's] interpretation was racially motivated is seemingly based only upon Plaintiff's own feeling, because it is unsupported by any evidence of discriminatory animus.").

*v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 134 (2d Cir. 1995)).  Plaintiff appears to concede as much. *See* Pl.'s Resp. to Mot. for Summ. Judg., Dkt. No. 41 at 15 ("Extending an employment relationship by one year by itself may not qualify as an adverse employment action.  But when coupled with the denial of tenure, it is assuredly an adverse employment action.") (quoting *Tolbert*, 790 F.3d at 436).  This concession may explain why plaintiff claims that, in January 2023, she not only had her probationary term extended but also had her tenure candidacy denied.  *See, e.g.*, Pl.'s Resp. to Defs.' Mot. Summ. J., Dkt. No. 41 at 15 ("In January 2023, defendants denied plaintiff tenure *and* issued a *Juul* agreement to extend her probationary period by an additional year.") (emphasis added).

No matter how frequently or adamantly plaintiff repeats it, that conclusory assertion, *i.e.*, that defendants denied her tenure—at any time, but especially in January 2023—finds no support in this record.  Instead, the record reflects only that plaintiff was offered, and signed, an agreement extending her probationary period.  Under these circumstances, such an extension alone is not a cognizable adverse employment action.

Because plaintiff can neither show that discriminatory animus informed the decision to defer a tenure decision, nor that the deferral was an adverse employment action, her first and second claims must be dismissed.

**2.      Elimination of Plaintiff's Position**

The Court now turns to plaintiff's remaining claim.  *See* Compl., Dkt. No. 1 at 10 ("By recommending the elimination of plaintiff and only plaintiff's full-time administrative position, defendants Gratto and the district intentionally discriminated against her on the basis of her race.").

22

Under *McDonnell Douglas*, "a plaintiff must first establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Id.* (citing *Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 253–54 (1981). "The burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). "If the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 804).

Defendants concede that plaintiff is "able to establish the first three elements of her prima facie case[.]" Defs.' Mot. Summ., J., Dkt. No. 31-1 at 19. They contend, though, that "she cannot establish that the abolishment of her position occurred under circumstances giving rise to an inference of discrimination." *Id.*

Yet "[t]he burden of proof at the prima facie stage is *de minimis*." *Fernandez v. Kinray, Inc.*, 406 F. Supp. 3d 256, 265 (E.D.N.Y. 2018) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). Among the mostly white administrative staff, plaintiff was the only full-time administrator whose position was eliminated. Her duties were subsequently reassigned to several white administrators. *See* Pl.'s Resp. to Defs.' Mot. Summ. J., Dkt. No. 41 at 26; Defs.' SOMF, Dkt. No. 37 at 32 ¶ 125. That is sufficient to establish plaintiff's prima facie case.

23

In turn, defendants have articulated a legitimate, nondiscriminatory reason for plaintiff's disparate treatment. As plaintiff notes, "Gratto justified eliminating [her] position by citing a severe budget shortfall." Pl.'s Resp., Dkt. No. 41 at 26; *see* Defs.' Mot. Summ. J., Dkt. No. 31-1 at 21 ("Simply put, the plaintiff's position was abolished because of the financial and budgetary constraints in the District[.]").

Of course, plaintiff asserts that this explanation is mere pretext. According to plaintiff, "[a] reasonable jury could reject defendant Gratto's explanation for why he terminated plaintiff, finding that [plaintiff] was an African American associated with improving the district's approach to diversity and equity and that these were not his priorities." Pl.'s Resp. to Defs.' Mot. Summ. J., Dkt. No. 41 at 27. Plaintiff emphasizes that, "[a]mong the few interactions Gratto had with plaintiff, he asked her to tell him about her restorative justice initiative during a directors' meeting; Gratto responded, 'We're not doing restorative justice in this district[.]'" *Id.* at 23. Accordingly, she suggests, "this court should conclude that . . . within two weeks of becoming Superintendent, defendant Gratto announced that a five-year plan aimed at implementing restorative justice initiatives, developed and led by plaintiff, was being eliminated[.]" *Id.* at 27. It is not clear how exactly this conclusion advances plaintiff's claim, and plaintiff does not elaborate. Nevertheless, the Court will try to discern how it is meant to support a finding in plaintiff's favor on this claim.

"While there is no unified theory, when focused on improving school safety, promoting positive school learning environments and increasing academic achievement, restorative justice is based on three core principles: (1) repairing harm, (2) involving stakeholders, and (3) transforming community relationships." *See* Thalia González, *Restorative Justice from the Margins to the Center: The Emergence of A New Norm in School Discipline*, 60 How. L.J. 267, 275

24

(2016).  Restorative justice is often juxtaposed with "zero-tolerance" school policies and exclusionary discipline.  *See* S. David Mitchell, *Zero Tolerance Policies: Criminalizing Childhood and Disenfranchising the Next Generation of Citizens*, 92 Wash. U.L. Rev. 271, 277 (2014) ("Under so-called "zero tolerance" policies, schools do not make exceptions or substitute punishments under any circumstances.  The result is often severe punishment for any breach of a rule, regardless of how minor or whether there are extenuating circumstances.").

"Zero tolerance became widely adopted in schools and accepted as the preferred means for addressing school conduct and meting out punishment in the early 1990s." *Id.*  "As these practices proliferated, a large body of research examined racial disproportionality in exposure to harsh disciplinary practices, finding that Black and Latinx youth are more likely to be exposed to schools with punitive disciplinary cultures, and that Black students in particular are suspended at higher rates than their White peers."  Miles Davison, et al., *Restorative for All? Racial Disproportionality and School Discipline Under Restorative Justice*, Am. Educ. Res. J. 2022 August 59(4): 687–718.

"Restorative justice has become popular in school districts across the U.S. over the last decade, and a joint 2014 report by the U.S. Departments of Education and Justice touted the use of restorative justice as a viable intervention that would improve equity and address the school-to-prison pipeline." *Id.*  Yet, "[d]espite the descriptive promise of restorative justice, existing research on restorative justice in schools finds that this practice may reduce disciplinary inequity in some contexts but unintentionally exacerbate it in others." *Id.* (internal citations omitted).

"Because a core tenet of restorative justice programs is being responsive to the goals and needs of the local community, their operations differ between school districts and in some cases between schools within one district." *Id.*  "While diverting students away from exclusionary

25

discipline is a key component of many restorative justice programs, it is notably just one facet of restorative justice." *Id.* "Most schools adopt a continuum of practices, many of which are not directly aimed at discipline but instead towards facilitating relational and inclusive school environments." *Id.*

Looking to plaintiff's filings, the Court is repeatedly offered the same assertion as indicative of supposed pretext in this record: "Specifically, plaintiff explained her plan to Gratto in a directors meeting, to which Gratto replied, 'We're not doing restorative justice in this district.'" Pl.'s Resp. to Defs.' SOMF, Dkt. No. 37 at 18 ¶ 66 (citing Butler Depo. at 210:5–211:25); Pl.'s Additional Facts, Dkt. No. 37 at 43 ¶ 65 (citing Butler Depo. 211:21–211:25) ("Gratto replied, 'We're not doing restorative justice in the district,' summarily dismissing plaintiff's five-year restorative justice plan.").

First off, Gratto's alleged comment, "we're not doing restorative justice in this district," is divorced from its context.

> [W]e were in a directors meeting, Mr. Gratto asked me, "Explain to me what this restorative justice is all about." I explained to him. I told him that it would change the culture of the school district, that it would greatly decrease suspensions, that it would create senses of empathy and respect among the students and staff. And he said, "Well, how are the teachers supposed to use that in their classroom?" And I explained to him that, with the training, over time that the students [] who had the training moving up from kindergarten all the way up through the [] grades, that they would have a different understanding of how to resolve conflict without having fights, who they could speak to if they did have a concern, how they could resolve things, how people could take accountability for anything that they did and apologize. This is the whole—the whole restorative justice program. And then he—after I explained that to him, he said, "Well, we're not going to do that." And that was the end of it. "We're not doing—we're not doing restorative justice in this district."

Pl.'s Depo., Dkt. No. 31-5 at 55.

26

Viewed in context, this exchange suggests Gratto objected to plaintiff's specific program proposal, not to the larger philosophy behind it.[7]  But even if Gratto was criticizing the broader philosophy, school administrators can disagree on pedagogy.  Even if one finds other methods misguided or lacking, that disagreement alone does not intrinsically signify animosity towards a protected class.

Yet plaintiff asks the Court to take another attenuated leap.  She argues that this disagreement over pedagogy illustrates not only broad hostility, but also that Gratto's explanation—that he eliminated her position due to budget constraints—was a pretext to disguise his discriminatory animus.  To be clear, the Court does not suggest that such a disagreement can never be offered as evidence of discriminatory animus.  But here, standing alone, it does not suffice to create a jury question on this claim.

The undisputed record shows no animus, only a school district facing a budget gap with no painless way to fill it.  *See, e.g.*, March 1, 2023, Budget Presentation, Dkt. No. 31-27 at 131 (proposing elimination of three social worker positions); March 15, 2023, Budget Presentation, *id.* at 183 ("At the last meeting: The public spoke passionately about the importance of keeping 7 social workers on staff.  The school board listened [and] expressed a desire to keep the 3 additional social workers for at least one more year."); March 15, 2023, Budget Presentation, *id.* at 147 ("Recommendation[:] Eliminate a [foreign] language position in the district[.]  Sections can

---

[7] *Cf.* Feb. 10, 2023, Update from Gratto to Board, Dkt. No. 31-24 at 12 ("Wednesday evening was busy with the HAC Wellness Meeting at 4:30 pm, Facilities at 6 pm, and Audit at 7:30 pm.  The Wellness meeting, chaired by Ms. Butler, was a bit underwhelming.  There were only three people in attendance other than me, and their main objective seems to be developing a plan to have therapy dogs in the schools.  I am not sure I am enthusiastic about this endeavor but I will remain open minded."); Jan. 27, 2023, Update from Gratto to Board, Dkt. No. 31-24 at 8 ("DASA Presentation — We were scheduled to have a DASA presentation for district parents on Tuesday night.  Apparently, Ricki Butler scheduled it for sometime in December but then it got postponed.  The event was advertised on facebook and on the webpage.  E-mails also went home to parents.  When Tuesday night came, Ricki was all set to present in the HS auditorium[.]  Unfortunately, only three community members showed up[.]  Since Ricki was hoping for a larger audience where there could be a question and answer period, she decided not to do the presentation and to postpone it to a later date.").

27

be reduced in elementary and secondary schools"); *id.* at 147 (suggesting foreign language instruction be offered beginning in sixth grade); *id.* at 177–79 (cutting elementary teachers would result in increased class sizes); *id.* at 189 ("Option #2: Exceed Tax Cap and Raise it to 3.36%"); *id.* at 191 ("Things to think about with option #2[:] Exceeding the Tax Cap Requires a 'supermajority' of 60% of the voters."); Gratto Depo., Dkt. No. 31-7 at 26 ("Q: For that year did the board vote to exceed the tax cap?  A: No, they didn't.").

Plaintiff's position was not unilaterally abolished.  It was eliminated at the same time, and in the same resolution, as the positions of four special education teachers, four elementary teachers, a secondary math teacher, a secondary science teacher, and two teacher aides.  *See* April 18, 2023, Board Minutes, Dkt. No. 31-4 at 3–4.[8]  And the record reflects that Gratto was not keen on eliminating *any* administration positions, including plaintiff's.  Gratto Depo., Dkt. No. 31-7 at 24 ("I spoke with the whole public.  In my board presentations throughout February and March I made the case showing data of why we should not eliminate an administration position.  Q: [W]hat was that case?  A: I would say that the case was we were not overstaffed in administration.  If we look at the data, the administration had already been reduced before I got here to the point where we were in a position where we could not easily get by with a loss of an administrator.").

Nonetheless, the Board asked Gratto to recommend an administrator position that could be eliminated—a recommendation he arrived at only after consulting with the deputy superintendent and the assistant superintendent for business.  *See* Oehler-Marx Decl., Dkt. No. 31-9 ¶ 24; Kosinski Decl., Dkt. No. 31-10 ¶ 26; Gratto Depo., Dkt. No. 31-7 at 23 ("[T]he board directed me to eliminate a position.  So I worked with my deputies to choose the position to eliminate and

---

[8] It is worth noting, however, that the reduction of the science and math positions coincided with the incumbents' retirements.  *See* March 1, 2023, Budget Presentation, Dkt. No. 31-27 at 96.

then I informed the board[.]"); *id.* at 24 ("[T]he board gave me the directive at a board meeting and they approved the abolition at the next meeting, so two weeks.").

There were eleven administrator positions to choose from: the high school's principal and assistant principal, the middle school's principal and assistant principal, the principals of the district's two elementary schools, the supervisor of elementary education, the director of technology, the director of pupil personnel services & special education, the athletic director, and the director of student support services (i.e., plaintiff's position). *See* Administrative Staffing History, Dkt. No. 31-27 at 136.

Gratto, Oehler-Marx, and Kosinski "determined that the building-level administrators[,] like principals and assistant principals[,] could not be eliminated[,] as they . . . were imperative to the operation of the school buildings[.]" Kosinski Decl., Dkt. No. 31-10 ¶ 27. "The Supervisor of Elementary Instruction . . . was not identified as the position for elimination as it . . . essentially comprised the duties of an Assistant Principal for the two elementary schools in the District[.]" Oehler-Marx Decl., Dkt. No. 31-9 ¶ 28. The three believed that the Supervisor's "responsibilities could not easily be broken apart and distributed to existing employees[;] [and] [i]n addition[,] it was a less costly position than the plaintiff's[.]" *Id.* That left the Director of Technology, the Director of PPS & Special Education, the Athletic Director, and the Director of Student Support Services.

Ultimately, the trio chose plaintiff's position, the Director of Student Support Services, to recommend to the Board for elimination. The three felt the position's duties "could be more easily broken down and redistributed to various other existing positions in the District without significant impact." Oehler-Marx Decl., Dkt. No. 31-9 ¶ 27; *see also* Kosinski Decl., Dkt. No. 31-10 ¶ 29 (noting plaintiff's position was "one of the more newly created positions").

29

Plaintiff does not appear to contest that the three considered these and other non-discriminatory factors in coming to a decision. *See, e.g.*, Pl.'s Depo., Dkt. No. 31-5 at 47 ("Q: When was the first time you heard that?  A: Probably two weeks before [the school board vote.]  I was told that my job was up for consideration for being eliminated because the teachers union was pushing for it[.]  Q: Who told you that?  A: The deputy superintendent Linda Oehler-Marx.  [T]he teachers union wanted an administrator position to be eliminated in addition to the teacher positions that were being discussed to be eliminated."); *id.* at 48 ("[W]e had already—all knew that there was a $5 million budget shortfall and that they were looking to make changes and cut programs and teachers and so forth.  So [Oehler-Marx] told me that it was a budget situation.  Q: Okay.  And that was before they had actually voted on the elimination?  A: Yes."); *id.* at 48 ("[Oehler-Marx] said, 'Your position is culture and climate.'  And that my position was the easiest to split up and farm out to other people . . . to take on my responsibilities.").

Instead, plaintiff emphasizes that Gratto "claimed that he considered eliminating [the] Athletic Director[] position but determined it would be more difficult to divide [those] responsibilities than those of plaintiff."  Pl.'s Resp. to Defs.' Mot. Summ. J., Dkt. No. 41 at 26.  "In making this determination, however, Gratto admitted that he lacked full knowledge of plaintiff's duties."  *Id.*  Gratto "also had limited insight into whether any physical education instructors could assume [the Athletic Director's] responsibilities."  *Id.*  "Indeed, Gratto also never reviewed [the Athletic Director's] performance evaluations before deciding to retain his position."  *Id.*

This argument reflects a belief that plaintiff's position could only be eliminated as a final resort.[9]  But that is not part of the legal standard for a discrimination claim.  To get to a jury,

---

[9] *See also* Pl.'s Depo., Dkt. No. 31-5 at 55 ("[I] remember communicating to Linda Oehler-Marx when she told me that my position was up for possible . . . elimination, I let her know that—that, you know, that's not really a good look to eliminate the position of someone who is over the age of 60, a woman who—a person who is a woman—

plaintiff needs to point to sufficient evidence (circumstantial or otherwise) that would tend to permit a rational jury to conclude that the relevant decisionmakers reached their decision to eliminate her position, at least in part, based on discriminatory animus.  Plaintiff has "point[ed] to no evidence whatsoever that the relevant decisionmakers . . . were motivated by discriminatory animus." *Tulino v. City of N.Y.*, 2018 WL 1568970, at *7 (S.D.N.Y. Mar. 27, 2018).  "In the absence of such evidence, it is not this Court's role to second guess Defendants' business decisions." *Id.*; *see also Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 132 (E.D.N.Y. 2023) ("Federal courts do not have a 'roving commission to review business judgments,' and may not 'sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions.'") (quoting *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 156 (E.D.N.Y. 2013)).

Plaintiff has failed to establish the requisite causal connection between her race and the allegedly discriminatory elimination of her position.  Accordingly, her third and final equal protection claim must be dismissed.

**3.      Municipal Liability**

The Court need not and does not consider whether plaintiff's allegations are sufficient to give rise to municipal liability for any of the underlying alleged constitutional claims by plaintiff because plaintiff cannot establish an underlying constitutional violation by a state actor.  *See Blanco v. Success Acad. Charter Schs., Inc.*, 722 F. Supp. 3d 187, 227 (S.D.N.Y. 2024) (citing *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006)).

**V.      CONCLUSION**

Therefore, it is

---

who is of color and a woman with a disability.  I said, 'Do you realize that that's not really a good look?' She said, 'Well,' and just shrugged her shoulders, and that was the end of the conversation.").

**ORDERED** that

1. Defendants' motion for summary judgment (Dkt. No. 31) is **GRANTED**; and

2. Plaintiff's claims are **DISMISSED with prejudice**.

The Clerk of Court is directed to terminate the pending motion (Dkt. No. 31), enter a judgment accordingly, and close the case.

**SO ORDERED.**

Dated:  March 27, 2026
       Utica, New York.

Anthony J. Brindisi
U.S. District Judge

32